IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LACY MILLER,

                Petitioner,

      vs.

GARY SWARTHOUT, Warden,

                Respondent.

No. 2:12-cv-01351-JKS

MEMORANDUM DECISION

Lacy Miller, a state prisoner proceeding *pro se*, filed an Amended Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Miller is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at the California State Prison, Solano.  Respondent has answered, and Miller has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

After a trial by jury, Miller was found guilty of the second-degree murder of Conrad Celestine and possession of a controlled substance.  The jury also found true the allegation that Miller used a knife in the commission of the murder.  Miller was found not guilty of two counts of attempted murder, shooting at an unoccupied vehicle, false imprisonment by violence, dissuading a witness by force or threat, and assault with a deadly weapon or by means likely to cause great bodily injury.  Miller was sentenced to an aggregate term of 16 years to life in state prison.

Through counsel, Miller direct appealed, arguing that 1) there was insufficient evidence to support his conviction for second-degree murder; 2) the trial court violated his Fifth

Amendment privilege against self-incrimination and the judicially-declared rule of immunity when it allowed the prosecutor to cross-examine Dr. Hart concerning the findings of two mental health professionals; 3) his claim that he was prejudiced by the cross-examination of Dr. Hart was preserved, and, in the alternative, trial counsel was ineffective for failing to object to the introduction of the challenged evidence on those grounds; 4) the trial court failed to *sua sponte* instruct the jury on attempted murder; and 5) the jury instructions on the natural and probable consequences doctrine erroneously permitted him to be found guilty of murder without malice. Miller also joined in the claims of his co-defendants which might benefit him.

The California Court of Appeal denied Miller's claims in a reasoned opinion. Through counsel, Miller raised all of these claims, except for his claim that the trial court failed to *sua sponte* instruct the jury on attempted murder, in his petition for review filed with the California Supreme Court. The supreme court summarily denied review.

While the direct appeal was pending, Miller, through counsel, filed a petition for writ of habeas corpus with the superior court. In his petition, Miller argued that, subsequent to trial, it was learned that "a male juror [named Damian Eke] who participated in the determination of defendants' guilt was romantically involved before, during, and after the trial with [Lisa Kimerer,] a longtime friend and lover of petitioner Miller" and failed to disclose that information while being selected and serving as a juror. Miller requested, *inter alia*, that the superior court order an evidentiary hearing on the matter.

The superior court held an evidentiary hearing over several days and ultimately denied Miller relief on the ground that he had not shown that, while Eke and Kimerer were acquainted,

Eke had learned that the Miller that Kimerer knew was the same Miller who Eke had helped convict.

Miller then filed a *pro se* petition for writ of habeas corpus with the California Court of Appeal, again arguing that he was denied various constitutional rights because juror Eke was biased due to his relationship with Kimerer.  The California Court of Appeal summarily denied the petition.  Miller renewed his claim of juror bias in a petition for writ of habeas corpus filed with the California Supreme Court, which the court also summarily denied.

## II. GROUNDS RAISED

In his *pro se* Amended Petition filed with this Court, Miller raises the following grounds for relief: 1) his second-degree murder conviction was supported by insufficient evidence; 2) "the judicially declared rule of immunity and Fifth Amendment privilege against self-incrimination were violated by the questioning of Dr. Hart about the competency trial reports; 3) his claim with regard to the questioning of Dr. Hart was preserved, and alternatively, counsel was ineffective for failing to preserve it; 4) he was denied various constitutional rights by Eke's presence on the jury; and 5) the jury instructions erroneously permitted him to be found guilty of murder without malice.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  Where there is no reasoned state-court decision denying a claim presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).  Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state-court decision was "objectively unreasonable."  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006)

(quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir 2005) (per curiam)).  Under the AEDPA,

the state court's findings of fact are presumed to be correct unless the petitioner rebuts this

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*,

537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Claim One: Sufficiency of the evidence

Miller first claims that there was insufficient evidence to support his conviction for

second-degree murder under either a direct perpetrator or aider and abettor theory.  The

California Court of Appeal denied this claim on direct appeal.  The court assumed for the sake of

argument that there was no substantial evidence that Miller was a direct perpetrator and that the

jury based his conviction on a theory of aiding and abetting, concluding as follows:

> "Under California law, a person who aids and abets the commission of a crime is
> a 'principal' in the crime, and thus shares the guilt of the actual perpetrator.  (§ 31.)"
> (*People v. Prettyman* (1996) 14 Cal. 4th 248, 259.)  "[A]n aider and abettor is a person
> who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the
> intent or purpose of committing, encouraging, or facilitating the commission of the
> offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of
> the crime.'"  (*People v. Prettyman, supra,* 14 Cal. 4th at p. 259.)  As we shall explain,
> there is overwhelming evidence Miller was aware of and shared Jefferson's murderous
> intent and aided her in the commission of Celestine's murder.
>
> Miller knew Jefferson was extremely upset over what had transpired at her home
> in her absence.  He witnessed Jefferson brutally attack Knowles in an attempt to learn
> what had gone on at her home while she was away.  He knew Knowles blamed Celestine
> for what had transpired.  He was at Jefferson's home when she told Celestine's stepson
> that "niggers would be falling" if her property was not returned.  Shortly before
> defendants went to Celestine's home, Miller told Celestine that *he* was coming over to
> retrieve Jefferson's keys.  Thereafter, all three defendants arrived at Celestine's home,
> and all three were armed.  Miller began "slicing and poking" Celestine with a knife after
> Celestine was on the floor and continued assaulting Celestine after Jefferson stated she
> intended to kill him.  Miller inflicted at least one dozen incised wounds.

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard). This Court must, therefore, determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id*. at 326; *see McDaniel*, 130 S. Ct. at 673-74.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac,* 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940)

("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . ."). A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.  *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

Miller argues that although there was eyewitness testimony that he repeatedly stabbed, sliced, and kicked the victim, there was conflicting evidence that Miller's knife did not cause the lethal wounds and that the eyewitness did not actually observe the murder.  Miller misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Where, as in this case, the question is one of credibility, the finding of the finder-of-fact must prevail.  *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).  As Miller himself notes, Charolett Celestine testified that she observed Miller and Rosetta Jefferson repeatedly stab Conrad Celestine and kick him in the head.  The California Court of Appeal determined that there was sufficient evidence of Miller's conviction on the theory of aiding and abetting the homicide.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  The record does not compel the conclusion that no rational trier of fact could have found the elements of the crime beyond a reasonable doubt, especially considering the double deference owed under *Jackson* and AEDPA.

Claims Two, Three and Four: Introduction of evidence regarding his competency evaluations

Miller next argues that the trial court violated his Fifth Amendment privilege against self-incrimination and the judicially-declared rule of immunity when it allowed the prosecution to cross-examine Dr. Robert Hart concerning the findings of two court-appointed mental health professionals, Dr. Kent Rogerson and Dr. Gary Cavanaugh, who determined that Miller was competent to stand trial.  He argues that his claim was preserved at trial, and, in the alternative, that trial counsel was ineffective for failing to preserve the claim.

At trial, Miller called Dr. Hart to explain a gap in Miller's memory.  Dr. Hart attributed Miller's memory loss of the homicide to post-traumatic stress disorder.  The prosecution then questioned Dr. Hart as follows:

| | |
|---|---|
| [PROSECUTOR]: | [T]he more facts you have, the more information you have, the more confidence one can have in one's opinion; is that generally a fair statement? |
| [DR. HART]: | That's a fair statement. |
| . . . . | |
| [PROSECUTOR]: | Okay.  Well, what about, would you want to know if other doctors had seen this man, Lacy Miller, and concluded that he's a malingerer, he makes this up? |
| [MILLER'S COUNSEL]: | Judge, we need to approach. |
| [PROSECUTOR]: | This is fair, your honor. |
| [MILLER'S COUNSEL]: | No, it's not.  We need to approach, please. |
| . . . . | |
| THE COURT: | I don't see anything in the statute that says it's confidential. |
| [MILLER'S COUNSEL]: | Yes, the issue in the 1368 [competency] proceeding, whether or not he's competent to stand trial, not whether or not there was any other issues or any other psychological evaluations.  They were done for that purpose, and whatever the doctors in the 1368 [hearing] decided is a different issue than what's before this jury. |
| THE COURT: | You can cover that in redirect.  Dr. Hart knows the difference between 1368 [competency hearings] and 1026 [insanity hearings]. |

-8-

. . . .
[DR. HART]:                        I suppose that would be worth knowing, yes.
[PROSECUTOR]:                      Would you agree that not everyone tells the truth?
[DR. HART]:                        I would agree.
. . . .
[PROSECUTION]:                     You come in frequently in murder cases and tell the jury
                                   one excuse or another?
[DR. HART]:                        I wouldn't call it frequently, but I have done that, yes.
[PROSECUTION]:                     So you've been conned before, haven't you?
[DR. HART]:                        Of course.
[PROSECUTION]:                     So wouldn't you want to know, hey, could this guy be
                                   conning me or could he be sincere?
[DR. HART]:                        Yes, it's important.

The prosecution then read to Dr. Hart portions of a competency report written by Dr.

Rogerson, in which Dr. Rogerson stated that "[i]t was clear that [Miller] was attempting to look

much more impaired than he might . . . be."  The prosecution also suggested that Dr. Cavanaugh

had likewise concluded that Miller was "malingering."

On redirect, Dr. Hart testified that he had since read the reports of Dr. Rogerson and Dr.

Cavanaugh and that those reports did not change Dr. Hart's opinion about whether Miller was

malingering when Dr. Hart interviewed him.  Rather, Dr. Hart opined that those reports

"indicated that [Miller] was probably exaggerating symptoms that he had.  Both doctors opined

that there might be some psychotic illness there but that [Miller] was presenting in a more

exaggerated fashion that what he needed to do to achieve some purpose."  Dr. Hart concluded

that Miller's "schizophrenia-like" symptoms made him more susceptible to post-traumatic stress

disorder.

On cross-examination, the prosecution asked Miller if his denial to a line of questioning

was an attempt to "con[] [the court] like [Miller] attempted to con the doctors."  The prosecution

later asked Miller if he "tried to play the doctors," and if he was attempting to "play" the jurors and "con them into thinking [he] had nothing to do with this."

During closing argument, the prosecution argued that defendants had "contrived" their claim of self-defense. The prosecution again argued that Miller had malingered and lied to his doctors about his condition, arguing that if Miller had lied to his doctors, he was likely to lie to the jury as well.

Miller argues that he was prejudiced by the examination of Dr. Hart because "the jury was permitted to infer that [his] self-defense claim was contrived, and that just as [he] was faking and conning the competency doctors, he was also faking and conning the jurors with his claim of self-defense."

On direct appeal, the California Court of Appeal denied Miller relief on this ground, concluding that trial counsel had forfeited this issue by failing to object to the elicitation of Dr. Hart's testimony on the ground that it violated the judicially-declared rule of immunity or the Fifth Amendment.

Respondent is correct in asserting this claim is procedurally defaulted. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "[I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default." *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted). The Ninth Circuit has repeatedly recognized and applied the California

contemporaneous objection rule in affirming the denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*,  *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Because the Court of Appeal held that this claim was forfeited under California's contemporaneous objection rule, this claim may be deemed procedurally defaulted.

If a petitioner has procedurally defaulted on a claim, a federal court may nonetheless consider the claim if the petitioner shows: 1) good cause for his failure to exhaust the claim; and 2) prejudice from the purported constitutional violation; or 3) demonstrates that not hearing the claim would result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750; *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992).  A trial attorney's ignorance or inadvertence does not amount to cause and prejudice.  *Murray v. Carrier*, 477 U.S. 478, 486-87 (1986).

It is firmly established under California law that "habeas corpus will not lie as a substitute for appeal . . . nor as a second appeal."  *In re Harris*, 855 P.2d 391 (Cal. 1993) (citing *In re Foss*, 519 P.2d 1073 (Cal. 1974); *In re Terry*, 484 P.2d 1375 (Cal. 1971); *In re Waltreus*, 397 P.2d 1001 (Cal. 1965); *In re Spears*, 204 Cal. Rptr. 333 (Cal. Ct. App. 1984); *In re Wagner*, 173 Cal. Rptr. 766 (Cal. Ct. App. 1981)).  Miller's claim is procedurally barred because he has not demonstrated cause and prejudice.  In any event, as discussed below, Miller's claim is meritless because there was no evidence to support his contention that he acted in self-defense.

The Court of Appeal likewise denied Miller's claim that his trial counsel's failure to properly object to the claim amounted to ineffective assistance of counsel, holding absent counsel's alleged error, there was no reasonable probability the jury would have concluded Miller acted in self-defense or imperfect self-defense.

Miller's claim that his trial counsel was ineffective for failing to object to the examination of Dr. Hart because it undermined his claim of self-defense is meritless.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  Miller must therefore show both that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

Even assuming that counsel's performance was deficient, Miller has not established that he was prejudiced.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  It was undisputed that Celestine was unarmed and laying on the ground when Miller began attacking him with a knife. There is no possibility that, even if the trial court had sustained a proper objection to the prosecution's elicitation of testimony that Miller had malingered, the jury could have found that Miller acted in self-defense.  The Court of Appeal's conclusion that Miller could not establish prejudice was not contrary to or an unreasonable application of federal law, and Miller is therefore not entitled to relief on this claim.

Claim Four: Juror bias

-12-

Miller next argues that he was denied his constitutional right to a fair and impartial jury where one of the jurors, Damian Eke, had allegedly had a relationship with Miller's girlfriend, Lisa Kimerer, during trial and did not disclose that fact during voir dire or the trial.  Miller raised this claim in his petition for writ of habeas corpus filed with the superior court.

The superior court held an evidentiary hearing over several days.  Although the court ruled that each party could contact the eight jurors who did not file any written opposition to being contacted, no jurors were called to testify.  It is unclear if they were not called because they declined to participate or if they did not have any information or insight as to whether Eke appeared biased during deliberations.

The superior court ultimately denied the petition in a reasoned, unpublished opinion, concluding in part as follows:

> . . . .
> In order for the Defendants to prevail on their Petitions for Writ of Habeas Corpus, the Defendants were required to establish the following five elements:
> 1. That Mr. Eke and Ms. Kimerer had some sort of an acquaintanceship before or during the Trial;
> 2. That during that acquaintanceship Mr. Eke learned of Ms. Kimerer's association with a Lacy Miller;
> 3. During that acquaintanceship Mr. Eke learned that the Miller with whom Ms. Kimerer had an association with was the same Miller who was on Trial for the murder on which Mr. Eke was a juror.
> 3. Mr. Eke had a duty to disclose that information to the Judge at some point during the Trial and failed to do so; and
> 4. Such failure to disclose deprived the Defendants of a fair Trial to the extent that prejudice arose requiring reversal.
> The Court finds that Defendants have established the first and second elements. The combined evidence presented by the Defendants that Ms. Kimerer and Mr. Eke knew each other prior to the Summer of 2007 is more substantial than the uncorroborated testimony of Mr. Eke that he first met Ms. Kimerer when she telephoned him sometime after the Trial.  The most compelling evidence . . . [was] the pass from El Dorado House, a residential drug treatment recovery facility, whereat Ms. Kimerer was residing, showing that she was allowed to leave the facility on a pass with Mr. Eke on May 9, 2006.

The Court further finds that the Defendants established the second element in that the preponderance of the evidence presented suggest that Ms. Kimerer at least mentioned a Lacy Miller while in Mr. Eke's presence.  Ms. Kimerer testified to her long-lasting relationship and love for Miller and lengthy relationship with Mr. Eke and that she often mentioned her love for Miller to Mr. Eke and his disapproval of her feelings.

Witness Katie Cannone testified regarding Ms. Kimerer's and Mr. Eke's prior relationship and confirmed the nature of their relationship as being an ongoing one involving drugs and sex.  Ms. Cannone also testified that on one occasion when Mr. Eke was present, Ms. Kimerer mentioned that Miller had a Trial or was going to jail and that there was really no response to Ms. Kimerer's comments by either Mr. Eke or Ms. Cannone; it was essentially as if neither she nor Mr. Eke heard what Ms. Kimerer was talking about.  Ms. Cannone further testified that it was long after the Trial that she first even heard about the murder, Miller's involvement, or what happened to him.  Mr. Eke testified that he has never met Katie Cannone.  Ms. Cannone's testimony that she knew Mr. Eke and that he talked funny (because of his accent which was quite noticeable during his testimony) was more persuasive that Mr. Eke's denial.

Defendants also presented witness Janet Austin who testified and confirmed Ms. Kimerer's substantial drug involvement and noted that Ms. Kimerer was at least attracted to Defendant Miller.  Mr. Eke maintained his testimony that he met Ms. Kimerer after the Trial and that there was one occasion when he picked Ms. Kimerer up at Ms. Austin's residence, but did not remain long enough to even sit down.  Ms. Kimerer testified that she, Ms. Austin, Miller, and Jefferson all grew up together; however, Ms. Kimerer only testified as to one occasion when she discussed the murder with Ms. Austin, and that was when Mr. Eke was present.  Ms. Austin testified that she did not recall any such discussion of the murder when Mr. Eke was present.

Ms. Kimerer also testified that at some point after the Trial was over, when she and Mr. Eke were driving by the scene whereat the murder took place, she mentioned that was the location where the murder took place and Mr. Eke replied that he was on the jury, but had never mentioned that before.  Ms. Kimerer stated that she got mad at him for sitting on that jury.  Mr. Eke replied that she did not know what she was talking about because the two Millers were not the same.  Ms. Kimerer testified that Mr. Eke must have known the two Millers were the same because she had Miller's picture on the wall.

In light of the circumstances of Ms. Kimerer, Ms. Austin, Miller and Jefferson having grown up together, and the relationship between Ms. Kimerer and Miller, there should have been far more discussion of the murder than was presented to this Court. The lack thereof suggests Ms. Kimerer did not discuss the murder with Mr. Eke as she claims to have done so.

Based on the foregoing and additional testimony of Ms. Austin, Ms. Cannone, and Ms. Kimerer herself, as presented by the Defendants, the Court finds that it has not been established that Mr. Eke realized that the Miller whom Ms. Kimerer had mentioned was the same Miller who was a Defendant in the Trial on which Mr. Eke sat as a juror.

Two matters for which no evidence was presented and supported the conclusion that Mr. Eke never tied the Defendant Miller to Ms. Kimerer's Miller are:

-14-

1. Nothing was presented during the Trial to suggest that Mr. Eke had been alerted to the fact that the two Millers were the same; and

2. No evidence was presented that Mr. Eke conducted himself in any manner during the Trial which suggested that he knew who the Defendant Miller was.

In *In re Carpenter* (1995) 9 Cal. 4th 634, 657, the Court noted that the lack of evidence that a juror, who was aware of impermissible information during the Trial, had communicated the information to any other juror negated any inference that the juror might be biased because of having that information. Here, the lack of evidence negates any inference that Mr. Eke had to know who the Defendant Miller was because of Mr. Eke's relationship with Ms. Kimerer.

The Court having found that the Defendants did not present sufficient evidence to support element three above, the Court will not rule on elements four and five.

Regarding the credibility of the witnesses, Ms. Kimerer was a long-time drug addict who had a motive to present testimony as favorably as possible to Defendant Miller and inferentially to the other two Defendants. Ms. Kimerer's ability to perceive the events and conversations that occurred when she and Mr. Eke were together and the current recollection of those events may well have been affected by her drug addiction as much as her feelings for Defendant Miller.

The Court does not find that Mr. Eke's lack of candor automatically makes Ms. Kimerer's testimony more truthful. The Supreme Court in *In re Carpenter*, *supra*, 9 Cal. 4th 634, dealt with a similar issue where the Trial Court had found the juror was basically committing perjury in testifying regarding the juror's misconduct and the Supreme Court held that the fact that a juror was perjuring himself did not automatically require the Trial Court to make a finding of prejudice. It is understandable, while not commendable, certainly that Mr. Eke minimized as much as possible the nature of his time and relationship with Ms. Kimerer, especially since he testified that he was married and his employment would have been jeopardized if his drug use was discovered. This case is not quite a he said/she said matter because this Court's opinion is that the testimony of the additional witnesses, Ms. Austin and Ms. Cannone, really minimized what Ms. Kimerer talked about regarding Defendant Miller and the murder, which leads to the ultimate conclusion that, while supporting the testimony that Ms. Kimerer met Mr. Eke before the Trial, they had a relationship, but that there was a good, valid basis for finding that Mr. Eke never connected Ms. Kimerer's Miller to the Defendant Miller.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury*." U.S. CONST. amend VI (emphasis added). The right to an impartial jury is further applicable to the states by way of the Fourteenth Amendment. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "The bias or prejudice of even a single juror is enough to violate that guarantee." *United States*

*v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)).  However, the constitution "does not require a new trial every time a juror has been placed in a compromising situation."  *Tinsley v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Id.* (quoting *Phillips*, 895 F.2d at 217).

The Ninth Circuit recognized three forms of juror bias: 1) "actual bias, which stems from a pre-set disposition not to decide an issue impartially"; 2) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury"; and 3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause."  *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) (plurality)).

Miller does not argue that Eke answered questions dishonestly during voir dire, and the transcripts of voir dire are not before this Court.  Miller's complaint appears to implicate the theory of implied bias.  The Ninth Circuit has concluded that although the Supreme Court has never held that a juror was impliedly biased in absence of juror dishonesty in voir dire, concurring opinions in Supreme Court cases have not foreclosed the possibility of finding implied bias in such circumstances and claims to that effect are cognizable on federal habeas review.  *Fields*, 503 F.3d at 771-72; *see also Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir.

1998) (finding implied bias claim cognizable on federal habeas review because "[p]resumed bias dates back in this country at least to Aaron Burr's trial for treason").

"It is well accepted that bias may be presumed only in 'extreme' or 'extraordinary' cases." *Fields*, 503 F.3d at 772.  Most of the Ninth Circuit's decisions presuming bias as a matter of law have involved situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Olsen*, 704 F.3d at 1191 (quoting *Fields*, 503 F.70 at 770).  "Prudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Tinsley v. Borg*, 895 F.2d 510, 527 (9th Cir. 1990).  A court might, however, presume bias where a juror or his close relatives have been personally involved in a situation with a fact pattern similar to the crime. *Id*. at 528.  Hypothetically, a court might likewise presume bias where it is revealed that the juror is an actual employee of the prosecuting agency, where the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. *Id*.  Courts have declined to find presumed bias where a juror was personally acquainted with a witness, provided no actual bias existed. *Id*. at 528-29.  Where a post-trial hearing has been held on juror impartiality and the fact-finding process was objective and reasonably explored the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. *Dyer*, 151 F.3 at 975.  A petitioner must therefore present clear and convincing evidence to rebut this presumption.  28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340.

The Supreme Court has made it clear that on federal habeas review, the determination of juror bias "is essentially one of credibility, and therefore largely one of demeanor." *Id.* (quoting *Yount*, 467 U.S. at1038) (internal quotation marks omitted).  The findings of state trial and appellate courts on juror impartiality deserve "a high measure of deference." *Id.* (citation omitted).

Here, Miller has not rebutted the state court's findings with clear and convincing evidence, but rather urges this Court to re-weigh the testimony and credibility of the witnesses who testified at the evidentiary hearing.  As the state court recognized, Kimerer had a history of drug abuse and may have been motivated to exaggerate her claims by her feelings for Miller.  On the other hand, Eke was not forthcoming, but also was motivated to minimize the scope of his relationship with Kimerer to protect his family and employment prospects.  The state court was in the best position to assess the demeanor and weigh the credibility of these and the other witnesses.  *See Patton v. Yount*, 467 U.S. 1025, 1038 ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. . . . Demeanor, inflection, the flow of questions and answers can make confused and conflicting utterances comprehensible.").  Kimerer notably testified, however, that after trial when she pointed out the crime scene to Eke, Eke denied knowing that the Miller he had helped convict "was the same [Miller] that [she] talked about every day."  Moreover, as the state court concluded, nothing was presented during trial to suggest that Eke had been alerted to the fact that the two Millers were the same, and there was no evidence that Eke conducted himself in any manner that would suggest he knew who the defendant Miller was.  After thoroughly reviewing the hearing testimony, this Court concludes that the state court's determination that there was no

evidence that Eke had connected the two Millers was not contrary to or an unreasonable

application of federal law.   Miller is therefore not entitled to a finding of presumed bias and his

claim is denied.

Claim Five: Natural and Probable Consequences Doctrine

Miller lastly argues that the jury instructions on the natural and probable consequences

doctrine erroneously permitted him to be found guilty of murder without malice.

On direct appeal, the California Court of Appeal denied Miller relief on this claim as

follows:

Under the natural and probable consequences doctrine, "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'" (*People v. Medina* (2009) 46 Cal. 4th 913, 920.)  The natural and probable consequences doctrine "allows an aider and abettor to be convicted of murder, *without malice* . . . ." (*People v. Culuko* (2000) 78 Cal. App. 4th 307, 322, italics added.)  As our Supreme Court recently observed: "[W]e have previously rejected the argument, advanced by defendant here, that the natural and probable consequences doctrine unconstitutionally presumes malice on the part of the aider and abettor." (*People v. Richardson* (2008) 43 Cal. 4th 959, 1021; see also *People v. Garrison* (1989) 47 Cal. 3d 746, 777-778; *People v. Bunyard* (1988) 45 Cal. 3d 1189, 1231-1232; *People v. Culuko, supra,* 78 Cal. App. 4th at p. 322 ["The [California] Supreme Court has repeatedly rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice."].)  Accordingly, Miller's argument that the jury instructions concerning the natural and probable consequence doctrine erroneously permitted him to be found guilty of murder without a finding of malice fails.

Miller's claim that the court's instruction on the natural and probable consequences

doctrine was erroneous in that it permitted him to be convicted of murder without malice is

without merit.   "[T]he fact that [an] instruction was allegedly incorrect under state law is not a

basis for habeas relief."  *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 502 U.S. 422,

438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *see also Bradshaw*, 546 U.S. 74 at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."). This Court's review is therefore limited to "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Miller, however, may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights. *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). This Court is bound by the California Court of Appeal's determination that the instruction as given was consistent with state law in the absence of any due process violation, and Miller is not entitled to relief on this claim.

## V. CONCLUSION

Miller is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); Ninth Circuit R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 22, 2013.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge